UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | **Criminal Number:** |
| | : | |
| v. | : | **VIOLATION:** |
| | : | **18 U.S.C. § 371** |
| **TONY C. RUDY,** | : | **(Conspiracy)** |
| | : | |
| **Defendant.** | : | |

INFORMATION

The United States charges that:

COUNT ONE

18 U.S.C. § 371 - Conspiracy

INTRODUCTION

Unless specified otherwise, at all relevant times:

1. Between 1995 and December 2000, defendant TONY C. RUDY was a staff member in the leadership office of a Member of the United States House of Representatives ("Representative #2"), serving first as Press Secretary and then as Deputy Chief of Staff.

2. In August 1999, while employed full-time by the House of Representatives, defendant RUDY caused the creation of a company called Liberty Consulting, LLC ("Liberty Consulting").

3. From 1994 to 2004, Jack A. Abramoff was a Washington, D.C. lobbyist. Between 1994 and January 2001, Abramoff was associated with a law and lobbying firm ("Firm A"). In January 2001, Abramoff joined a second law and lobbying firm ("Firm B").

4. In December 2000, defendant RUDY resigned from the office of Representative #2 and joined Abramoff in January 2001 as a lobbyist in the Washington, D.C. office of Firm B.

5. Abramoff, defendant RUDY, and other lobbyists at Firm B represented groups and companies throughout the United States, including Native American tribal governments operating, and interested in operating, gambling casinos. Abramoff, defendant RUDY and other lobbyists at Firm B sought to further their clients' interests by influencing public officials, including Members of the United States Congress.

6. From March 2000 through 2001, Michael Scanlon worked with Abramoff at Firms A and B as a public relations specialist who provided services to clients throughout the United States. In or about January 2001, Scanlon established his own business to provide grassroots work, public relations services, and election campaign support to his and Abramoff's clients.

7. In July 1999, Abramoff established Capital Athletic Foundation ("CAF"), a private charitable entity for which he sought and received federal tax-exempt status.

8. In July 2002, defendant RUDY resigned from Firm B and went to work at the office of another Washington D.C. lobbying firm ("Firm C").

9. At all times relevant to this Information, the Rules of the U.S. House of Representatives:

   a. prohibited gifts, except under limited circumstances, to Members of Congress and staff members of more than $50 at one time, and a total of $100 per year from one source;

   b. prohibited trips paid for by private sources, unless the trip had an official purpose, and prohibited all trips paid for by lobbyists regardless of the purpose;

    c.    required that Members of the House and staff members at or above a specified salary threshold file public Annual Financial Disclosure Statements with the Clerk of the House reporting, among other things, (i) all gifts in excess of $285 from any source given to a Representative or staff member during the calendar year; and (ii) all travel and travel-related expenses paid by outside sources totaling more than $285 in that year; and

    d.    required that trip disclosure forms contain detailed information about the purpose, cost and sponsor of a trip that was paid for by private entities or persons, and be filed with the Clerk of the House within 30 days after the trip was completed.

## THE CONSPIRACY

10.    From 1997 through 2004, in the District of Columbia, and elsewhere, the defendant,

**TONY C. RUDY,**

did knowingly conspire and agree with Abramoff, Scanlon, and others to commit the following offenses against the United States:

    a.    to devise a scheme and artifice to defraud and deprive the citizens of the United States and the United States House of Representatives of the right to the honest services of defendant RUDY and others, including the right to conscientious, loyal, faithful, disinterested and unbiased service to be performed free of deceit, undue influence, conflict of interest, self-enrichment, self-dealing and concealment, by corruptly accepting as a public official, and later corruptly offering to other public officials, while defendant RUDY was a lobbyist, a stream of things of value, with

        the intent to influence and reward official action and agreements to perform official action, all contrary to 18 U.S.C. §§ 1341, 1343, and 1346;

  b.  to devise a scheme and artifice to defraud and to obtain money and property through false and fraudulent misrepresentations, pretenses and promises, and to deprive clients of defendant RUDY and Firms B and C of their right to defendant RUDY's honest services, performed free from deceit, fraud, concealment, conflict of interest and self-dealing, all contrary to 18 U.S.C. §§ 1341, 1343, and 1346; and

  c.  to knowingly make, with the intent to influence, communications to and appearances before employees of the leadership office of Representative #2, within one year of his employment by Representative #2, on matters for which defendant RUDY was seeking official action on behalf of other persons, contrary to 18 U.S.C. § 207(e).

## PURPOSE OF THE CONSPIRACY

11. The purpose of the conspiracy was for defendant RUDY and his coconspirators to unjustly enrich themselves by corruptly accepting and providing a stream of things of value with the intent to influence and reward official acts, making misrepresentations to their own clients and attempting to influence Members of Congress in violation of the law.

## MANNER AND MEANS

12. The conspiracy was carried out through the following manner and means:

  a.  While defendant RUDY worked in the leadership office of Representative #2, he received money and other things of value from or at the direction of Abramoff and others, including approximately $86,000 in payments to Liberty Consulting, tickets

to sporting events, meals, golf and golf trips. During the same time period, defendant RUDY routinely performed official acts for or at the behest of Abramoff and others, which were motivated in part by the things of value he received. While employed in the leadership office of Representative #2, defendant RUDY was in regular telephone and email contact with Abramoff and provided advice and official assistance to Abramoff on numerous issues.

b. To conceal his relationship with Abramoff and others, defendant RUDY failed to disclose, in violation of the Rules of the House of Representatives, various things of value he received from Abramoff and others.

c. After leaving government service and joining Abramoff at Firm B, defendant RUDY, Abramoff, Scanlon, and others would offer and provide things of value to public officials to ensure favorable official action and other assistance for their clients when needed. In particular, defendant RUDY and Abramoff and others offered things of value to a member of the U.S. House of Representatives ("Representative #1") and members of his staff, including an all-expenses-paid golf trip to Scotland; food and drink at Abramoff's restaurants; tickets to sporting events and concerts in luxury suites at the MCI Center, Camden Yards Stadium, and FedEx Field; and use of those suites during sporting events and concerts for campaign fund raisers. During the same time period, in exchange for this stream of things of value, Representative #1 agreed to take favorable official action and render other assistance on behalf of the clients of Abramoff and defendant RUDY.

d.  To partially fund a golf trip to Scotland, defendant RUDY and Abramoff solicited $50,000 from two clients of Firm B by falsely representing that Representative #2 had requested the payments be made to CAF and by failing to disclose how the money was intended to be used.

e.  To further enrich defendant RUDY while he worked for Firm B, Abramoff arranged for defendant RUDY to receive through Liberty Consulting monthly payments of $5,000 from a tribal client for additional services, when no additional services were performed or were intended to be performed.

f.  Defendant RUDY and Abramoff caused certain clients of Law Firm B to pay $75,000 to a public policy organization to obtain position papers and press coverage from the public policy organization favorable to the clients' interest, while defendant RUDY failed to disclose to the clients that he would and did receive $25,000 of his clients' funds from the public policy organization.

g.  Within one year of leaving his position as Deputy Chief of Staff to the leadership office of Representative #2, defendant RUDY, with the knowledge and encouragement of Abramoff and others, communicated with and appeared before employees of the leadership office of Representative #2 with the intent to influence official action.

## OVERT ACTS

In furtherance of the conspiracy and to achieve its purposes, defendant RUDY, Abramoff and others committed the following overt acts, among others, in the District of Columbia and

elsewhere:

1. In or about March 2000, Abramoff purchased admission tickets, that cost approximately $800 each for himself and defendant RUDY, to attend the U.S. Open golf tournament at Pebble Beach, California, treating defendant RUDY to an all-expenses-paid trip to the golf tournament aboard a private jet.

2. On or about June 19, 2000, defendant RUDY received a $10,000 check by mail, payable to Liberty Consulting, from a non-profit organization, as arranged by Abramoff.

3. In or about July 2000, defendant RUDY advised Members of Congress to vote against proposed legislation limiting gambling on the internet, without disclosing that defendant RUDY gave this advice in part because Abramoff had asked him to oppose the legislation and without disclosing that Abramoff provided things of value to defendant RUDY.

4. On or about July 14, 2000, defendant RUDY received a $5,000 check by mail, payable to Liberty Consulting, from a non-profit organization, as arranged by Abramoff.

5. On or about August 9, 2000, defendant RUDY received a $5,000 check by mail, payable to Liberty Consulting, from a non-profit organization, as arranged by Abramoff.

6. On or about September 14, 2000, defendant RUDY received a $5,000 check by mail, payable to Liberty Consulting, from a non-profit organization, as arranged by Abramoff.

7. On or about October 19, 2000, defendant RUDY received a $5,000 check by mail, payable to Liberty Consulting, from a non-profit organization, as arranged by Abramoff.

8. In or about January 2001, within one year of having left his position with Representative #2's leadership office, defendant RUDY communicated with staff members in the office in

an attempt to influence official action on proposed legislation allowing for reparations to certain U.S. Citizens from the domestic assets of foreign companies and governments.

9. On or about March 20, 2002, defendant RUDY and Abramoff solicited and received Representative #1's agreement to insert into election reform legislation, during the Conference Committee's consideration of that legislation, an amendment lifting a gaming ban for one of Abramoff's clients that was affected by the ban.

10. In or about April 2002, defendant RUDY and Abramoff encouraged a former staffer to Representative #1 to attempt to influence Representative #1 on legislative matters within one year of the staffer having served as Chief of Staff to the Representative.

11. On or about May 14, 2002, defendant RUDY caused a public policy organization to pay $8,000 to Liberty Consulting after having caused a client of Firm B to make a $20,000 grant to the public policy organization.

12. On or about May 24, 2002, defendant RUDY invited Representative #1 and his Chief of Staff to travel to Scotland in August, informing the Chief of Staff by email that the trip would involve golf, "drinking, and smoking cubans."

13. On or about June 6, 2002, defendant RUDY solicited via email a payment of $25,000 from a client of Firm B by misleading the client into believing that Representative #2 had requested the funds for a charitable organization, when the funds were to be used to partially fund a golf trip to Scotland for Representative #1 and others.

14. On or about June 27, 2002, Abramoff solicited and defendant RUDY accepted a payment of approximately $5,000 to Liberty Consulting from a client of Abramoff's even though

Liberty Consulting did not render any services to the client.

15. In or about August 2002, Representative #1 and two members of his staff were taken to Scotland and London by private jet on an all-expenses-paid-trip to play golf at The Old Course at St. Andrews and other golf courses.

All in violation of Title, 18 United States Code, Section 371.

Dated: March 31, 2006

ANDREW C. LOURIE
Acting Chief, Public Integrity Section

Mary K. Butler
M. Kendall Day
Trial Attorneys
Criminal Division
U.S. Department of Justice

PAUL E. PELLETIER
Acting Chief, Fraud Section

Guy D. Singer
Nathaniel B. Edmonds
Trial Attorneys
Criminal Division
U.S. Department of Justice