ATTACHMENT A

CR 06-082 (ESH)
**FILED**

FACTUAL BASIS FOR THE PLEA
OF TONY C. RUDY

MAR 3 1 2006

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

This statement is submitted to provide a factual basis for my plea of guilty to the charge filed against me.

1. Beginning in 1995, Tony C. Rudy ("Rudy") was a staff member in the leadership office of a Member of the United States House of Representatives ("Representative #2"). From 1995 through 1998, Rudy served as Press Secretary. From 1998 through December 2000, Rudy served as Deputy Chief of Staff.

2. From 1994 to 2004, Jack A. Abramoff ("Abramoff") was a Washington, D.C., lobbyist. In 1994, Abramoff joined a law and lobbying firm ("Firm A"). In January 2001, Abramoff joined a second law and lobbying firm ("Firm B").

3. From March 2000 through 2001, Michael Scanlon ("Scanlon") worked for Firms A and B in Washington, D.C., providing public relations services to clients throughout the United States. Scanlon worked on behalf of many clients together with, and at the direction of, Abramoff. Over time, Rudy knew that Scanlon also operated his own business providing grass roots and public relations services with Abramoff or his clients called Capital Campaign Strategies ("CCS"), even though he was not involved in the negotiations for or performance of CCS's grass roots and public relations services nor did he receive funds from Scanlon directly or indirectly.

4. In December 2000, Rudy resigned from the House of Representatives to work with Abramoff as a lobbyist in the Washington office of Firm B beginning in January 2001. Abramoff was instrumental in Rudy's being hired by Firm B. At the end of July 2002,

1

Rudy left Firm B and went to work for another Washington-based lobbying firm ("Firm C") started by a former colleague of Rudy from the office of Representative #2 ("Lobbyist B").

5. At all relevant times, Abramoff solicited and obtained business with groups and companies throughout the United States, including Native American tribal governments operating, and interested in operating, gambling casinos. Abramoff directly and through his team of lobbyists sought to further his clients' interests by lobbying public officials, including Members of the United States Congress. Typically, Abramoff, Rudy and the other lobbyists working with them communicated with the clients and each other by interstate electronic mail, interstate telephone calls, and private or commercial interstate mail carriers. Payments were often made by interstate wire transfer or checks that were mailed or delivered by commercial carrier engaged in interstate commerce.

6. Abramoff established a private foundation called Capital Athletic Foundation ("CAF"). Payments to CAF were often made by interstate wire transfer or checks involving interstate funds transfers.

7. In August 1999, Rudy established a company called Liberty Consulting, LLC, ("Liberty Consulting") through which his wife would provide consulting services. While Rudy was working for the government, Liberty Consulting received payments for services to be performed by his wife. As Rudy knew, Lobbyist B shared some clients with Abramoff. Rudy made the arrangements for payments made through Abramoff and Lobbyist B. Payments were often made by checks that were mailed to Liberty Consulting's address.

8. Beginning in 1997, Abramoff and others engaged in a course of conduct through which one or more of them corruptly offered and provided a stream of things of value to public officials with the intent to influence or reward a series of official actions and agreements to perform official action, and public officials corruptly accepted the stream of things of value knowing that they were given with the intent to influence or reward official action. Rudy knowingly and voluntarily participated in this scheme first as a government official receiving things of value and then as a lobbyist providing to public officials things of value with Abramoff and others.

9. The things of value corruptly given to Rudy and others included, but were not limited to, repeated travel, golf fees, frequent restaurant meals, entertainment, election support for candidates for government and employment for relatives of officials.

10. The official acts and influence, and agreements to provide official action and influence, included, but were not limited to, agreements to garner support for and to support and pass or oppose legislation, agreements to place statements in the Congressional Record, agreements to contact personnel in United States Executive Branch agencies and offices to influence decisions of those agencies and offices, and meetings with clients of Abramoff and others.

Rudy's Violation of His Duty of Honest Services as a Government Official

11. As part of this course of conduct described in paragraphs 8 through 10, from as early as January 1997 through December 2000, things of value were offered to or accepted by Rudy while he was a staff member in the Office of Representative #2, including but not limited to the following:

3

a. All-expenses-paid trips provided by Abramoff, clients of Abramoff and clients of Lobbyist B, or Abramoff's business interests, including trips to the following locations:

   i. an April 1999 trip to Hilton Head, South Carolina with his wife; and

   ii. a 2000 trip to the U.S. Open in Pebble Beach, California by private jet;

b. Numerous tickets for entertainment, especially sporting events, including, at Rudy's request for himself and for others, use of a box suite plus seven additional tickets to host a bachelor party at an August 2000 Washington Redskins football game, hockey tickets, including play-off tickets, and tickets to the Daytona 500 in Florida. As part of this scheme, Abramoff would provide tickets to entertainment and sporting events to Rudy for his own use as well as to distribute to other congressional staff members and Members of Congress;

c. Regular meals, including at expensive restaurants in Washington, D.C.;

d. Frequent golf and related expenses at courses in the Washington, D.C. area and elsewhere, and golf clubs costing several hundred dollars;

e. Payments arranged by Abramoff from a non-profit entity to Liberty Consulting as a retainer fee for consulting services to be performed by Rudy's wife. From June 2000 through February 2001, payments totaling $50,000 were made in monthly installments of $5,000 except for the first month's payment of $10,000. The first month's payment was double the monthly installment because it included $5,000 for services that were not rendered. Rudy was aware that Abramoff arranged for at least one of his clients to make donations to the non-profit entity and that this money was used to make payments to his wife. Rudy had assisted that client

4

through official actions he performed as Deputy Chief of Staff.

12. As part of the course of conduct described in paragraphs 8 through 10, beginning at least as early as 1997 through December 2000, Abramoff and others sought and received Rudy's agreement to perform a series of official acts, including, but not limited to, his agreement to assist Abramoff in providing services to his clients and to enhance Abramoff's reputation to assist him in securing clients, to assist in stopping legislation against the interests of certain clients and to assist in supporting or opposing actions to be taken by other agencies and departments of government. Rudy and others agreed to use and did use their official positions and influence, including, but not limited to, the following:

   a. In January 2000, Rudy agreed to arrange for another staff member to travel to the CNMI with Scanlon and others in part to assist Abramoff, his firm, and Lobbyist B with their lobbying businesses;

   b. In 2000, Rudy worked with others to secure certain appropriations projects for the CNMI which he knew would help Abramoff's lobbying business and that had been sought by Abramoff and Lobbyist B;

   c. In March and April 2000, Rudy obtained a letter from Representative #2 to an Executive Branch official opposing a postal rate increase that would have harmed one of Abramoff's clients;

   d. In the summer of 2000, Rudy assisted Abramoff in devising and implementing a strategy to defeat proposed legislation restricting internet gaming by, among other things, personally lobbying Members of the House of Representatives and their staff that he knew would benefit Abramoff's client.

5

Honest Services Fraud Involving Representative #1

13. As part of the course of conduct described in paragraphs 8 through 10, after becoming a lobbyist, Rudy participated in and was directly aware of providing things of value to and soliciting and obtaining the agreement from a Member of Congress ("Representative #1") and members of his staff to use their official positions and influence to assist Abramoff, his clients and others, including, but not limited to, the following actions:

   a. Representative #1's agreement in March 2001 to support legislation that would enable Abramoff's clients to continue to manufacture clothing with labels representing it was manufactured in the United States without being subject to the same wage and labor standards as companies operating in the continental United States; and

   b. Representative #1's agreement in approximately March 2002 that, as the Co-Chairman of a Conference Committee of House and Senate Members of Congress, he would introduce and seek passage of legislation that would lift an existing federal ban against commercial gaming in order to benefit a client of Abramoff, a Native American Tribe in Texas.

Rudy's Lobbying Ban Violation

14. As part of the course of conduct described in paragraphs 8 through 12, beginning in January 2001 and continuing through December 2001, Rudy, working with Abramoff, contacted individuals employed by the leadership office of Representative #2 within one year after Rudy left the office in December 2000. Rudy and Abramoff intended that Rudy communicate with the staff of Representative #2 for the purpose of influencing official action on behalf of clients of Abramoff, Rudy, Firm B, and others working with them

6

despite the one-year ban that prohibited Rudy's lobbying of them, including the following actions:

a. From January 2001 to March 2001, Rudy solicited from the office of Representative #2 support for legislation providing for reparations payments to certain U.S. citizens from assets in United States of foreign companies and governments; and

b. In or about July 2001, Rudy coordinated with the leadership staff of Representative #2 on legislation affecting automobile emissions.

Fraud Based on Rudy and Abramoff's Affirmative Misrepresentations and Material Omissions

15. On June 6, 2002, Rudy, at Abramoff's direction, solicited one of Firm B's clients, a distilled beverages company, to make a $25,000 contribution to CAF by falsely claiming it was a favorite charity of a public official. Abramoff and Rudy intended to use this money for their personal and professional benefit to partially pay for a golfing trip to Scotland for Abramoff, Rudy, Representative #1, members of his staff and others, although Rudy did not ultimately go on the trip. The client made a check payable to CAF, which Abramoff and Rudy knew would be mailed or sent by commercial carrier from outside of Washington, D.C.

16. In or about April 2002, Rudy and Abramoff advised the distilled beverages company that it should make a $20,000 contribution to a non-profit public policy group in Washington, D.C., as part of the company's lobbying effort. Rudy and Abramoff knew that the funds would be sent by interstate wire or by check that would be mailed or sent by commercial carrier. Rudy and Abramoff failed to disclose that $8,000 of this money was paid to Rudy through Liberty Consulting by the public policy group.

7

17. In June 2002, Rudy, at Abramoff's direction, solicited one of Firm B's clients, a Native American Tribe in Michigan, for a $25,000 contribution to CAF made by check, which they knew would be mailed or sent by commercial carrier, by falsely claiming that a public official requested them to solicit funds for the charity from their clients. Abramoff and Rudy intended to use this money for their personal and professional benefit to partially pay for a golfing trip to Scotland for Abramoff, Rudy, Representative #1, members of his staff and others, which Rudy ultimately did not attend.

18. From February 2002 through July 2002, Abramoff, with Rudy's knowledge and consent, arranged for payments totaling $25,000 to be made to Liberty Consulting by one of Firm B's clients, a Native American Tribe in Mississippi. The payments were made in five monthly installments, which were usually sent by mail. Rudy knew that no additional services were being provided to the client for the payments.

19. From January 2001 through October 2002, Rudy solicited and caused three other clients of Firm B and Firm C, including his own clients, to make payments to a non-profit public policy organization totaling approximately $55,000. With Abramoff's assistance, Rudy received payments from the public policy organization totaling $17,000 to Liberty Consulting without disclosing to his clients that he would and did receive these payments. The payments to Liberty Consulting were usually mailed.

The preceding statement is a summary, made for the purpose of providing the Court with a factual basis for my guilty plea to the charge against me. It does not include all of the facts known to me concerning criminal activity in which I or others engaged. I make this statement knowingly and voluntarily and because I am in fact guilty of the crime charged.

DATE: 3/31/06

_____
TONY C. RUDY
Defendant

_____
LAURA ARIANE MILLER, ESQ.
KELLY B. KRAMER, ESQ.
Attorneys for Defendant